**FILED**

DEC - 7 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SEA SEARCH ARMADA**<br>15600 NE 8th St.<br>B1-462<br>Bellevue, WA 98008 | \| |
|  | \| |
| Plaintiff, | \| |
|  | \| |
| v. | \| |
|  | \| |
| **THE REPUBLIC OF COLOMBIA**<br>Serve:  The Secretary of State<br>ATTN:  Director of Special Consular Services<br>U.S. Department of State<br>2201 C Street NW<br>Washington, DC 20520 | \| |
|  | \| |
| Defendant. | \| |

Case: 1:10-cv-02083
Assigned To : Urbina, Ricardo M.
Assign. Date : 12/7/2010
Description: Contract

## COMPLAINT

**COMES NOW** Plaintiff Sea Search Armada ("SSA"), by and through undersigned counsel, and hereby respectfully asks this Honorable Court for judgment against Defendant The Republic of Colombia ("Colombia" or "GOC") on the grounds and in the amounts as hereinafter set forth.  In support of such claims, Plaintiff hereby avers as follows:

### Jurisdiction and Venue

1.  This Court has jurisdiction to entertain this action pursuant to 28 U.S.C. § 1330 in that this litigation is a nonjury civil action against a foreign state and there is no immunity against such suit on the part of the foreign state.  See 28 U.S.C. § 1605.

2.  Venue in this Court is proper pursuant to 28 U.S.C. § 1391(f)(4) in that the Defendant is a foreign state.

## Parties

3.  Plaintiff SSA is a Delaware corporation engaged in the business of ocean salvage worldwide.

4.  Defendant Colombia is a foreign state as that term is defined in 28 U.S.C. § 1603.

## Factual Background

### A. The Galleon San Jose

5.  On June 8, 1708, the galleon *San Jose* was sunk by the British navy during a naval battle near the coast of Colombia.  Based on archival research conducted by SSA, at the time the *San Jose* was sunk, it was carrying cargo from the Spanish Viceroyalty of *Tierra Firma*, primarily from what is now Peru, via the Isthmus of Panama.  Furthermore, based on SSA's research the San Jose is located on the edge of the Continental Shelf at a depth of approximately 1,000 feet.

6.  Once again based on SSA's archival research, the cargo of the *San Jose* was precious metal in the forms of coins and bullion, which were privately owned by Peruvian and European merchants.  Based on SSA's research and analysis by independent experts in mineral values, the current value of the cargo is between $4 billion and $17 billion.

7.  In 1980, the Glocca Morra Co. ("GMC") requested and was granted permission from an agency of Colombia, the *Direccion General Maritima* ("DIMAR") to explore the Colombian Continental Shelf for shipwrecks.

2

8. Colombia has provided DIMAR with the authority to regulate and control certain maritime activities including, "the exploration of antiquities and treasures of sunken ships and shipwrecks [and] put forward the formalities to enter into the corresponding extraction or recovery contracts." By Resolution 48 of 1980, DIMAR granted GMC's request.

9. Between 1980 and 1985, GMC identified six (6) locations thought to be the sites of ancient shipwrecks, and reported them to Colombia. Specifically, in December 1981, GMC located what it believed to be the *San Jose* on the Continental Shelf off of the coast of Colombia and this location was formally filed in 1982 with Colombia under the terms of Resolution 48.

10. GMC and Colombia then engaged in negotiations for a contract to recover the *San Jose*. The parties eventually reached an agreement whereby GMC would receive thirty five percent (35 %) of the treasures recovered from the site. GMC subsequently assigned or transferred its rights under its agreement with Colombia and its rights in the treasure found at the *San Jose* site. Subsequently SSA initiated preliminary identification surveys and conducted initial salvage operations retrieving pieces of timber and other materials from the *San Jose* site. Despite its accord with SSA, the Government of Colombia delayed signing the written agreement it had drafted, and eventually refused to sign the offer it had made to SSA.

11. Despite the terms of the agreement between GMC (and its assignor SSA) and Colombia, the GOC refused to permit SSA to perform full salvage operations at the *San Jose* site.

12. Subsequently in 1984 the Colombian Parliament enacted a law giving Colombia all rights to treasure salvaged from the San Jose site eliminating all of SSA's property rights in the treasure (the "Seizure Law"). The Seizure Law provided that SSA would receive only a five percent (5%) finder's fee and that this finder's fee would be taxed at a rate of forty-five percent (45%).

13. Believing that the retroactive Seizure Law violated the Colombian Constitution as well as international and United States law, after fruitless negotiations with Colombia to modify the Seizure Law, in 1989 SSA filed suit against Colombia in the Circuit Court of Barranquilla, Colombia and later in the Colombian Constitutional Court.

14. Subsequently on March 10, 1994, the Colombian Constitutional Court ruled in SSA's favor finding that the Seizure Law was unconstitutional and void. Based on this ruling, on July 6, 1994, the Circuit Court entered judgment finding that the treasures of the *San Jose* were owned in equal (50% and 50%) shares by Colombia and SSA.

15. Subsequently, Colombia appealed the Circuit Court's decision to the Colombian Superior Court. In 1997 Colombia's appeal was denied.

16. Thereafter, Colombia appealed to the Supreme Court of Colombia (the highest judicial authority in that country). On July 5, 2007 the Colombian Supreme Court issued a ruling (the "Colombian Ruling") denying Colombia's appeal and finding that Colombia and SSA owned any treasures recovered from the *San Jose* site in equal shares.

**B.  Chronology of Colombia's Bad Faith Actions Against SSA: 1980-2010**

17.  **March 20,1980**: The Government of Colombia (GOC) officially outlined the legal procedure Glocca Mora and the GOC must follow regarding its quest for the San Jose: 1) search for targets  and file location of targets with GOC, followed by 2) preferential negotiations between the two parties for recovery of any finds.  Predicated upon this accord, Glocca Mora, and subsequently Sea Search Armada (SSA), invested millions of dollars searching the areas licensed exclusively to it by the GOC.

18.  **November 1981**: Glocca Mora (GM) joined with other investment groups to form the partnership of Sea Search Armada (SSA) with the objective of continuing the search for the San Jose using the Submarine, August Piccard.  Colombian Navy observers were on board the Piccard and its tender at all times.  In addition, the Piccard was shadowed by a Colombian Navy diesel electric submarine of WW II vintage.  The location of the Piccard was known at all times by the GOC, as were the locations of SSA targets based upon observations of Colombia Navy personnel.  Nevertheless, when GM was completing the search of the licensed area identified as of prime interest by SSA marine historians, the GOC ordered the SSA Survey Director to disclose to it in writing the location of the target thought to be the San Jose.  Immediately upon completion of the survey stage, the sub crew and Survey Director were informed by the GOC and the Cartagena Harbor Master that their work there was finished, and future permission to enter Cartagena Harbor would be denied.

19.  **Feb. 16, 1982**: Glocca Mora/SSA filed with the GOC agency having jurisdiction, DIMAR, the "Confidential Report of Submarine Exploration," which also included coordinates of the target thought to be the San Jose, although the location was

already known to the GOC from their observers and from the locational information it demanded from SSA's Survey Director. The coordinates in the report were based largely on a 1:80,000 nautical chart and assumptions of seabed locations based upon underwater triangulation. Sophisticated and precise digital navigation equipment was not yet available. Years later it became available in the form of first, LORAN, and later, GPS.

20. **July 18, 1982:** As soon as the GOC came into possession of the San Jose's location, it began, at the highest level, to surreptitiously develop a scheme to take over the properties of the American investors without losing the support of the US Government. Lilliam Suarez, Legal Secretary to Pres. Betencur, hypothesized that the GOC could twist its present laws to increase its share from 50% to 95% of the San Jose. She directed GOC lawyers to undertake legal research to support her case. On July 18, 1982 the legal opinion was delivered to her. It did not support her case, but denied it. The GOC lawyers opined that SSA had a property right of 50% of the proceeds from their finds, and also, as stated in the legal opinion, had *"the privilege of entering into a contract with the State for its* (i.e. finds) *removal."* The GOC opinion was consistent with the March 20, 1980 official GOC procedure (above) governing the search and salvage process upon which GM and SSA investors based their investment. Moreover, the 1982 official legal opinion requested by Suarez specified that the procedure she proposed would violate Colombia's constitution.

21. **July 15, 1983:** Legal Secretary to Pres. Betencur Suarez was not satisfied with the results of the GOC's legal research, and was determined to reduce SSA's share to 5%. She ordered a second legal opinion. The second legal opinion, like the first, opined that a finder's share of 5% was inconsistent with Colombian law. In the final

paragraph, the report states, "*The rights which may be applied in favor of the Glocca Morra Company are equal to one-half of that which is recovered, according to the text of the Civil Code, that is, that which is found is divided into equal parts and the Glocca Morra Company has the right to that portion for having obtained the respective permit through Resolution 354 of 1982, as stated in the draft of the response referred to initially.*" The legal opinion was signed by Admiral Miguel Rangel Santos. Subsequent actions by Suarez and her conspirators indicate she was fully aware, having read and discussed the GOC's several and consistent legal opinions, that her objective of taking 90% of SSA's share (reducing it from 50% to 5%) was illegal. The records show that her next steps were to devise legal trappings and sophistry that would serve as a fig leaf to cover the GOC's theft.

22. **September, 1983**: Ted Dimitry, Admiralty lawyer in Houston, went to Colombia as an agent of SSA, carrying a document to file officially with the GOC to amend the coordinates filed in 1982. However, when he met with the Navy representatives to file the amendment they strongly discouraged such a filing. He returned to Houston without filing the amendment, and later prepared an affidavit describing the incident.

23. **September 21, 1984:** While Lilliam Suarez was working behind the scenes to expropriate SSA's properties, her co-conspirators in the GOC kept SSA busy with the pretense of a contract negotiation to recover the San Jose. After several months of delays the GOC finally offered contract terms it expected SSA to refuse. SSA's share was reduced from 50% to 35%. SSA's protestations were stonewalled. The GOC's bad faith offer in light of its own legal research, which was known to SSA, became a serious

concern, particularly given the GOC stalling tactics that had extended the negotiation for months.  SSA worried the GOC would take SSA's entire share, in the manner of a Banana Republic.  Under such duress, SSA formally accepted in writing the GOC offer of a 35-65 split.  The accord was reached September 21, 1984.

24.  **November 2, 1984.**  The GOC sent letter 3315 which recognized accord on the salvage contract it had tendered to SSA.  However, the GOC continued to delay signing the contract.  During 1984, the GOC (Suarez) decreed that the property discovered by SSA was owned entirely by Colombia, and that SSA was entitled only to a finder's fee of 5%, taxable at 45%.  The Executive Branch decree, which the GOC, by its own legal research, knew to be illegal, was eventually declared illegal at every stage of the Colombia judicial process: the Constitutional, Civil, Superior and Supreme Courts. During the 23 years that SSA was denied access to its properties:

> 1) the civil court sequestered SSA's property to prevent a recurrence of GOC efforts to preempt its decision by contracting to a third party for salvage of the San Jose,
>
> 2) the Superior Court  officially reprimanded the GOC for attempted coercion of judges in both the Civil and Superior courts,
>
> 3) the GOC recklessly and  publicly revealed the location of SSA's properties, which had been disclosed to the GOC in confidence, thereby exposing the property to looting. It is estimated that more than 100 entities worldwide have both the motive and the means to loot the SSA site using state of the art deep diving submarines, search equipment, etc., provided they have the approximate location; and
>
> 4) the Constitutional Court ruled that the actions taken by the GOC to confiscate SSA's property was unconstitutional, and therefore illegal.

25. **June 10, 1985:** Fearful of Executive and Legislative actions to expropriate its property, SSA sent another letter urging the GOC to sign the contract which both parties had agreed to months earlier.

26. **1986**: President Bettencur sent to the parliament a bill drafted by his Legal Secretary, Lilliam Suarez. The bill was enacted as Law 26. Its purpose was to expropriate SSA's properties in the guise of a legal act. Following enactment, Law 26 was applied retroactively to SSA, although such an action was clearly in violation of Colombia's constitution.

27. **March 27 & 28, 1987**: Secret meetings between Swedish business interests and the GOC were held at the Presidential retreat near Cartagena. After President Bettencur was succeeded by President Barco, the plan of Lilliam Suarez to steal SSA's property was implemented by the Barco Administration, largely by Barco's Chief of Staff, German Montoya. Twenty three years later, in 2010, German Montoya, as a member of the Antiquities Commission, was involved in yet another attempt by the GOC to take over SSA's targets. At the clandestine meetings near Cartagena in 1987, Suarez's plan to screen out SSA using a charade of contracting with another sovereign nation was discussed and refined. Private Swedish contractors conspired with Barco and his staff members at the meetings, and a proposal from the Swedish businessmen to recover the San Jose was in effect approved as the winning bid over the nine sovereign nations who later would be invited to bid. The Cartagena meetings resulted in a covert agreement to award the contract to Swedish businessmen following a charade of inviting and evaluating bids from several unsuspecting sovereign nations. Payoffs to influential Colombians was assured by the Swedish businessmen. A year later, the secret meetings

and the corrupt participation by German Montoya, President Barco and others erupted into a national scandal when, during a Parliament committee hearing, the secret meetings were revealed, and that President Barco's Legal Secretary had not only attended the meetings, but taken notes. The notes revealed that 1) the salvage of the San Jose would be done **not** by governments, but by private businesses, 2) the Swedes would pay "commissions" to certain influential Colombians, and 3) the fix was in for the Swedish businesses to win the ostensible "competitive bidding" process in the guise of the sovereign Kingdom of Sweden. The expected profits for the recovery of the San Jose were to flow to the **GOC-owned private business, Ecopetrol**, and later to the GOC. The GOC and Swedish businessmen agreed at the secret meetings that the Ecopetrol-Swedish enterprise would operate using the same private business model the GOC had developed and employed with private business such as Occidental Petroleum.

28. **June 15, 1987**: The GOC issued the Requests for Proposals (RFP) to the Swedes and to nine unsuspecting nations. Upon receiving the RFP, the US Ambassador to Colombia cabled a copy to the State Department, DC. The potential problem of a confiscation of SSA's properties was raised. The Ambassador requested instructions from DC.

29. **November 5, 1987:** SSA's Colombian lawyer, a partner of Baker & McKenzie, reported, both orally and in writing, a "long meeting" with Lilliam Suarez. She put the argument that SSA had no rights to its finds. SSA's lawyer, Jorge Lara, wrote in his memo of the meeting *"She considers that what Sea Search Armada has is an expectation under the law, but not a concrete legal right."* On the face of it, her sophistry is the antithesis of the rule of law, and contrived as a fig leaf to cover the theft

of SSA's properties. It led to 19 years of litigation in which her opinion was denied at every level of Colombia's judicial system, as it had been by two separate legal studies ordered by her but ignored because they did not achieve the desired result of wresting the San Jose from the American investors. It apparently did not matter to Suarez and to others who later implemented her plan that the Americans had complied in good faith with every applicable Colombia law and regulation.

30. **July 15, 1988:** The SSA Managing Director, in an effort to regain SSA's rights to its properties telephoned an influential Colombian by the name of Mauricio Obregon, who served on the newly created Antiquities Commission, one of whose tasks was to solemnize the corrupt deal with Swedish businesses by declaring the *faux* "Government of Sweden" the winner of a competitive bidding process. Obregon was intractable, and ended the conversation with, "The matter is settled. We expect to sign a contract (with the Swedes) very shortly."

31. **July 18, 1988:** The GOC-owned private company, Ecopetrol, delivered a Memorandum of Agreement (MOA) to the Swedes. The MOA, contained the terms and splits already agreed upon in secret meetings. The GOC increased its share of treasure yet again. The Swedes were to receive a share approximating 25%, even less than the 35% the GOC demanded from SSA four years earlier. However, the Swedish share would be significantly reduced by the "commissions" it would pay to influential Colombians, and by the payment of SSA's finder's fee of 5%, increasing the GOC's share further. By shifting payment of the finder's fee entirely to the Swedes, the GOC also provided an adverse incentive to the Swedes to find or invent a reason not to pay the Americans. The deal with Swedish businesses again betrays the GOC's nose for profits regarding the San

Jose. Of particular note was the large size of the work area given to the Swedes by Ecopetrol (AKA Empresa Colombiana de Petroleos). The Swedes could salvage anything within an area of 100 nautical miles surrounding the SSA site.

32. **July 23, 1988**: German Montoya, President Barco's Chief of Staff answered a letter from US Congressman Guy Van Der Jagt, assuring him rather haughtily, *"Colombia does not make secret agreements,"* an ironic claim considering his well documented secret meetings which were about to be exposed by the parliament. As the scandal was exposed by the Parliament, with ample documentation that the deal violated several Colombian laws, it aroused the interest of the Comptroller General (the nation's separately elected watchdog agency), who eventually rebuked the GOC and charged that the contract with the Swedes was in fact illegal.

33. **July 29, 1988**: The Swedish newspaper Dagens Nyheter announced that Swedish business interests had won the contract to salvage the San Jose. Harry Schein was identified by the newspaper as the president of the Swedish investment bank that would pass for the sovereign Kingdom of Sweden. In fact, the only purpose of the bank was to serve as a false front for the private businesses that would actually do the work. The Swedish paper reported that *"On several occasions, Schein has himself conducted negotiations directly with Colombia's President Barco (whose wife is American with Swedish parents)."* No mention was made of the secret meetings with Barco and Montoya which preceded by several months the GOC's issuance of Requests for Proposal to the unsuspecting sovereign nations. At the same time, a Colombian newspaper carried the headline, *THE SWEDES WILL EXECUTE THE RECOVERY OF THE GALLEON.* The Swedes, it reported, would pay SSA's finder's fee, leaving the vast majority of

proceeds, and no financial risk, to the GOC.   The Colombian paper also stated that the contract would be carried out *"...between governments, which would carry out the project and would select government agencies or private entities of the respective country to execute the same under its total responsibility."* (Emphasis added)  Other newspapers reported that all the work would be done by private businesses after the Swedes paid "commissions" to influential Colombians.

34. **August 4-24, 1988**: Leading Colombian newspaper, *El Espectador*, reported that graft in the Swedish deal involved the President's Chief of Staff, German Montoya. Its headline was *"SWEDISH FIRMS (were) PROMISED COMMISSIONS."* Corruption in the GOC deal with the Swedes was reported by both of the leading Colombian newspapers, and by Siglo, which headlined *"A SCANDAL IS FORESEEN AMONG HIGH OFFICIALS"* and reported *"...a traffic in influence of major importance...may involve the Secretary General of the Presidency, German Montoya."* It reported the secret meeting in Cartagena March 27-28, and noted it occurred *"...three months before the government invited other companies to present their offers for the retrieval of the galleon and the recovery of its treasures."*

35. **January, 1989:** After two years and several unsuccessful attempts to settle its differences with a hostile and uncooperative GOC, SSA engaged Colombian counsel Danilo Devis to sue the GOC in Colombian courts for SSA's rights.  The suit was filed in the Civil Court in Barranquilla.  It soon became clear the GOC's principal legal defense tactics were ~~was~~ dilatoriness and coercion of judges.

36. **May 22-24, 1989**: As the scandal of the secret deal between the Swedes and the GOC became more public, and therefore more threatening to its conspirators, the

Barco Administration initiated an alternative strategy. It quietly invited a small group of American academicians and technicians to a "*Meeting for the Recovery of the San Jose*" in Cartagena. SSA was pointedly neither informed of the meeting nor invited to it. Nor was it mentioned as the acknowledged finder of the ship, nor that it had filed a lawsuit against the GOC four months earlier claiming the finder's share of 50% property rights. SSA obtained a list of those invited and on May 23 sent each participant a certified letter explaining SSA's position. The US Department of State informed SSA it had officially complained to the GOC that SSA had not been invited. The GOC's Vice Foreign Minister for the Americas answered the Ambassador's complaint by stating, "...*while the Shipwreck Committee* (an official GOC committee and the ostensible host of the meeting*) regrets that representatives of Sea Search Armada were unable to attend the meeting*" (no mention of not being invited)...the Committee could meet with (SSA) in November. The GOC reply to the American ambassador was ironic; by November the GOC expected to have a fully executed contract with the Swedes, thereby making a meeting with SSA moot, and a waste of SSA's time and money.

37. **July 23, 1989:** Secretary General German Montoya answered a letter from Congressman Van Der Jagt, "...*Colombia does not make secret agreements in any case, and all its acts are subject to the formalities and publicity that the law establishes.*" Montoya's mendacity is stunning for chuzpah in the light of the scandalous facts emerging from the Colombian Parliament hearings regarding his execution of Suarez's plan, and the official public statements by the nationally elected head of Colombia's watchdog agency. Montoya goes on to inform the U.S. Congressman that, "*Based on what has been put forth, I do not think it necessary to entertain fears about the*

*recognition of the rights of the Sea Search Armada company and that, therefore, the position of Colombia is found to be clearly one of full respect for the same in accord with the law.* "  Presumably according to the law as construed by Lilliam Suarez, who argued that SSA had no legal rights to the San Jose, only an *"expectation"* based upon the laws."

38.  **August 11, 1989**: Less than a month after German Montoya's misleading reply to Congressman Van der Jagt, Mr. John Hagard,  the Charges de Affaires at the Swedish Embassy,  Washington DC, replied to an inquiry from the House Committee on Foreign Affairs Chairman, Dante Fascell.  Mr. Hagard contradicted German Montoya's claims, that the deal with the Swedes was a government to government deal.  Hagard stated unequivocally *"...the Swedish government is not a party to any operation regarding the San Jose.*"  To leave no doubt that the Swedish parties were private businesses and not a government entity, despite the grandiose claims of Harry Schein, Hagard states, *"An independent Swedish company showed interest in a Colombian request/tender for assistance in salving the ship.  In the event a contract is signed between this company and any party on the Colombian side, the Swedish company will have exclusive responsibility for its own contractual rights and obligations."* (Emphasis added)

39.  **August 24, 1989**: Secretary of State Lawrence Eagleburger informed the Managing Director of SSA that *"...Ambassador McNamara personally underscored to President Barco the United States Government's keen and continued interest in seeing the Colombian authorities negotiate in good faith with representatives of your company. I have to report to you in all frankness that the Colombian response to this latest demarche was a reiteration of the decision to award a salvage contract on a government-*

*to-government basis."* Secretary Eagleburger went on to say *"the Swedish bid to obtain the contract appears to have fallen by the wayside now that the Swedes have privatized the public sector investment bank that had been negotiating with the Colombians."*

40. **November 3, 1989:** The newspaper El Tiempo disclosed that the contract with the Swedes had fallen through, but that the GOC might continue the project on its own (presumably with the help of the American technicians it had assembled in Cartagena six months earlier): *"The Swedish investment bank initially chosen went private. Although the change does not alter the guidelines set by Colombia, the government may not approve it. If there is no definitive agreement with the Swedes, the country* (Colombia) *will do the job of identifying the treasure."* In other words, the GOC's face-saving position was that it would continue with the salvage project on its own, presumably while still denying justice to SSA. The article goes on to report that the watchdog agency, Comptroller General of the GOC, warned against *"unbridled expectations of profit,"* from the San Jose *"...as there is no certainty of profits for the country."* Clearly the GOC viewed the project in business terms, as it worked through the private but state owned company Ecopetrol operating under a business model with the clear expectation of business "profits" for the GOC and a few political insiders.

41. **November 6, 1989**: The Colombia newspaper headline reads *SALVAGE OF THE GALLEON SAN JOSE IN DANGER OF FOUNDERING.* The watchdog agency, Comptroller General, asks that the contracting process with the Swedes *"be frozen,"* because of several questionable aspects, including: 1) *"Some bidders were given better treatment than others,"* and 2) the profits to Ecopetrol and the nation could be increased by tougher negotiations with the salvor.

42. Also in November 1989 the Colombia newspaper *El Espectador* stated, *"It is now known that the Swedish investment Bank will no longer be the intermediary for the project, because recently it went private."* One might add that it "went private" suddenly and without warning following the inquiries three months earlier from Secretary of State Eagleburger and Committee Chairman Fascelli. The GOC had already signed the contract and submitted it to Sweden for the signature of the president of the investment bank, but the bank instead was sold off and its president, Harry Schien retired to a remote area in northern Sweden. The GOC was left standing at the altar; no legitimate foreign government was willing to join it in a project to recover the San Jose, particularly in light of the flagrant corruption of influential Colombians. Although the GOC blustered that it would finish the project on its own, the face-saving was not taken seriously.

43. Although the corrupt *faux* government to government deal between private parties in Sweden and Colombia had failed, the GOC refused to enter settlement talks with SSA. Although its own legal research in 1982 and 1983 left no doubt SSA could win the case on its merits the GOC employed dilatory tactics to keep the matter in the Colombian judicial system nineteen years, during which time it attempted to influence the judges with a) public opinion, b) coercion, and c) when it reached the Supreme Court, created a vacancy on the Court and appointed a replacement who had been a defense lawyer opposing SSA. Despite the obvious conflict of interest, Uribe's new appointee argued his case against SSA, and refused to recuse himself when his bias and background became known. A majority of the Supreme Court eventually forced his recusal and rendered a majority opinion in favor of SSA July 5, 2007.

44. **June 10, 1992**: The GOC, via its Ambassador to the US, Garcia-Parra, answered a letter from House Ways and Means Committee Chairman Dan Rostenkowski urging the GOC to settle with SSA.   At least a dozen such letters emanated from Capitol Hill over the years, and all received more or less the same reply from the GOC, to wit: 1) the legal dispute was in the hands of the Colombia Judicial Branch, and by Colombian law could not be settled before the litigation was concluded (absolutely untrue), and 2) as used by Garcia-Parra in his letter to Chairman Rostenkowski, *"You may be assured that the Colombian Government will abide by the decision of the Colombian Courts on SSA's claim."* In closing he says, *"...it is the objective of my government that SSA's claim be dealt with fairly and in accordance with applicable Colombian law."* However, when the Constitutional Court found in SSA's favor, and ruled that the GOC's actions toward SSA were unconstitutional, a ruling that could not be appealed, the GOC did not abide by the ruling but continued its dilatory tactics. The matter remained in the Colombian court system another fifteen years. **None of these GOC promises to Congressmen and Senators to settle with SSA were kept**. Even after the Colombia Supreme Court upheld the rulings of the lower courts on July 5, 2007, the GOC refused to settle with SSA or to allow SSA access to its properties, going so far as to threaten military force if SSA attempted to access its property.

45. **October 1993:** The GOC signed a contract with noted treasure hunter (and later fugitive) Tommy Thompson for US $817, 203.30.  The contract was arranged by and through Fabio Echeverri Correa.   The ostensible purpose of the contract was *"...verification of the coordinates of the place where the San Jose galleon supposedly lies."*  The tactic was to hire a credible American to say he had searched at the

coordinates filed by SSA and found nothing there. The GOC's new focus on a small, precise location for SSA's work area was in sharp contrast to its contract with the Swedish businesses who agreed to a work area of 100 square miles. Echeverri's tactic had two objectives: 1) to make moot and preempt the deliberation of the Civil Court ("it doesn't matter whether SSA has 50% or 5% of nothing"), and at the same time rally public opinion to influence the judges of the Civil Court, and 2) to gather such information at the site as might be needed to plan and execute the second stage of the project: salvage of the San Jose. SSA's request to accompany and to observe the operation was ignored. Echeverri's attempts to take over the San Jose go back to 1982. According to The book, *"The Lost Galleon: Where is the San Jose?"* by Jorge Bendeck Olivilla, in 1982 Fabio Echeverri represented Northwest Energy, a US Company with business interests in Colombia, which attempted to take over the San Jose in that year. In 2010 Echeverri has again used his political connections in a scheme to take over the San Jose.

46. **December 12, 1993**: *El Espectador* reported the contract with Echeverri-Thompson, and indicated the expedition would be undertaken early in 1994 and completed by June. The GOC assured the public that the expedition was not to salvage the ship, *"but rather to locate and identify it, since the nation wants to prepare to the fullest its negotiating arguments before raising the wooden hull...."* Again, the GOC approached the recovery as a private business. The GOC had observers on board SSA's tender ship and submarine, viewing the seabed through the portholes. It had shadowed SSA's submarine, Piccard, with its own WW II vintage diesel-electric submarine. And it had discussed all such observations with SSA staff. Hence, the GOC knew as much or

19

more about the San Jose target as SSA management.  Yet President Gaviria's Secretary

General (Chief of Staff), Miguel Silva, announced in a GOC press release that it had only

one piece of information, a sonar image, and had no idea what Thompson would find at

the coordinates the GOC had given him.  Silva is quoted as saying, *"The only thing we*

*have is a sonar print* (absolutely untrue)*, delivered by Glocca Mora.  If that is the San*

*Jose or not we will know when the operation we have contracted for is finished, because*

*as of this moment we have no idea what exists there."*

47. **July 6, 1994**: The 10th Civil Court of Barranquilla, after enduring four and a

half years of GOC dilatory tactics and undue influence, ruled in keeping with the

Constitutional Court, that SSA owned 50% of *"economic, historic, cultural and scientific*

*value which are found within the coordinates and adjacent areas.[1]"*    Of equal

importance, the court sequestered the site, thus ending the plan of the GOC and Echeverri

to initiate salvage, that is, the Stage II it had announced six months earlier.

48. **July 8, 1994:**   The GOC issued a press release which tried to put the best

face on the Civil Court ruling and sequestration, which was an embarrassment to the

GOC.  It did not want to further alienate the courts by pursuing its plan to salvage the San

Jose in the face of the sequestration order.  Neither could it retract its many press releases

leading up to the expedition, including the contract to pay more than $800,000 to a

private contractor represented by Echeverri.  Its press release published July 8, 1994

---

[1]. In the original Spanish, *"dentro de las coordenadas y areas aledanas...."*  Further, the
Civil Court's sequestration order, October 12, 1994, states, *"...enlas coordenadas
senaladas o sus vecindadas* (neighborhood).  As construed by the GOC in its agreement
with the Swedes, the "neighborhood" would cover 100 square miles. Although the
sequestration discouraged further intrusions at SSA sites by the GOC or its contracted
third parties, it would have had no effect on looters.

seems to be primarily a face-saving tactic intended to take some of the sting out of a

defeat in court which overshadowed the Echeverri-Thompson expedition.   The GOC

press release implies that the GOC acted in good faith to verify its suspicion that SSA had

falsified the location it had filed in 1982.  Its headline reads, "GOVERNMENT SAYS IT

HAS NO TRACE OF GALLEON."   The lead-in states, "*Hours after a Barranquilla

*court 'divided' the treasure of the Galleon San Jose, the National Government issued a*

*press release in which it assures that the famous vessel...is not at the coordinates where it*

*had supposedly been located.  'There is no trace', assured the message yesterday from*

*the Office of the President.*"   The press release does not mention the dramatic changes in

navigational technology since 1981 and the fact that SSA's coordinates were scaled off a

1: 80,000 nautical chart dated 1937.  The press release includes the following paragraph:

> After nine days of work at sea[2], under the supervision designated
> by the Nation, the expedition returned to Cartagena de Indias on
> July 3 and presented a verbal[3] report yesterday to the office of the
> President of the Republic with the results of this scientific
> investigation.

---

[2] The cost for the expedition's 9 days at sea came to $91,000 per day in 1994 dollars.
SSA obtained a bid in 2010 for the same ostensible services (survey and map, take
samples and photos, check for looting) and the bid was less than 10% of the GOC's
payment to Echeverri-Thompson.  This would suggest that the vast majority of the fees
were expended for other than marine operations.  SSA's 2010 bid did not include legal
fees or "commissions."

[3] No authenticated written report of the Echeverri-Thompson expedition was produced,
nor was it verified that an expedition mobilized and searched at coordinates supplied by
SSA. A Spanish language written report without attribution was surreptitiously left on a
desk in the court's chambers. Tommy Thompson disappeared without authoring a report
or becoming involved in further Echeverri or GOC activities.  His name was soon
tarnished by accusations from a Federal District Court judge and by investors of financial
improprieties.

49. The GOC press release offers descriptions of the survey area that do not match the location disclosed by SSA. Specifically, *"The scientific analysis of the areas also yielded a very flat marine floor...."* And, *"The depth turned out to be significantly greater than that contained in the information given at the time by Glocca Morra Company (Sea Search Armada)."* It is clear the Echeverri-Thompson expedition either never took place (no observers were allowed), or was sent, or went, someplace other than the site SSA surveyed in 1981, 1982, and 1983. All SSA missions to the site were attended by the ever-present GOC observers. The location was also charted by the Colombian Navy. SSA delivered both still and video images of the site, which included intriguing coral formations and piles of worked wood on a slope, neither of which was mentioned in the GOC press release. The 1983 expedition collected detailed videos and still images of the woodpile and coral formation, which were shown to the GOC observers. In addition a video tape of the site prepared by SSA was delivered to the GOC in 1987, and was shown widely on Colombian television stations. The SSA site shown on the tapes clearly was not the same as visited by the Echeverri-Thompson expedition, and the coordinates shown in large print on the cover of a Spanish language report covertly placed in the judge's chambers in 1994 did not match any of the coordinates duly filed by SSA with the GOC. All this would suggest that the Echeverri-Thompson expedition, if it occurred, was on a mission, not to survey the site known to be the location openly and frequently visited by SSA and GOC observers over a span of three years, but to support arguments that 1) SSA had filed inaccurate coordinates and was entitled to nothing, and 2) the case brought by SSA was moot, and should be thrown out.

50. **July 15, 1994**: The Presidency of the Republic signed a contract with Pacific Geographic Society (PGS) to search for treasure ships on the Serranilla Banks. With a lofty title similar to the respected *National Geographic Society,* the entity was to be used as the GOC's poster child for shipwreck recovery, and, more importantly, the acceptability of the conditions then on trial in Civil Court. Ocean Sciences Research Institute (OSRI) was to be involved as a contractor to PGS. It had participated in, and reportedly helped organize, the 1989 conference in Cartagena on the recovery of the San Jose. The address for the Institute was San Diego, CA. Upon learning of the contract SSA's Managing Director paid a visit to the OSRI's given address in San Diego, but found no office, only a mailbox mounted atop a post by a road in a light industrial area. An examination of all offices within a block of the mailbox revealed none for either OSRI or the Pacific Geographic Society. All the terms and conditions designed by Lilliam Suarez in 1983 for the express purpose of disenfranchising SSA were dutifully accepted by the "North Americans." They were to receive a small share, between 5% and 25%, and would supply all the risk capital, equipment and knowhow. The GOC would take the lion's share with no risk. However, before the GOC press releases could celebrate the poster boy contract it was preempted in the media by the Civil Court ruling in favor of SSA.

51. **November 9, 1994:** Four months after the Civil Court ruling, Foreign Minister Turbay told US Ambassador Forchette he was willing to meet with SSA for settlement discussions. The GOC had promised several senators and congressmen it would settle with SSA if the Civil Circuit Court ruled in favor of SSA. At the time the GOC promises were made, the Constitutional Court had already ruled in favor of SSA,

and as that ruling could not be appealed, a Civil Court ruling in favor of SSA was certain unless the GOC could intimidate and coerce the judges to render a ruling inconsistent with present laws. Information discovered later proved the GOC was attempting to do just that. See June 21, 1995 for details. Knowing the Civil Court would likely rule against it, and lacking success with its intimidation tactics, **the GOC made promises to United States officials it had no intention of keeping**. After the Civil Court ruling four months earlier, Foreign Minister Turbay told Ambassador Forchette the GOC would honor its commitment to a settlement meeting. The GOC had one small condition for the settlement: SSA must first agree to the same contract terms as the Pacific Geographic Society reportedly agreed to, including the 5% finder's fee the Civil Court had just ruled should be a 50% property right. Thus the GOC wasn't honoring its promise to settle, it was dictating terms that SSA must accept in advance of the meeting. Ambassador Forchette reportedly cabled the GOC offer to the State Department November 9. However, neither the State Department in DC nor Ambassador Forchette reported the offer to SSA or to the several Congressmen who had received the GOC bad faith promises. Nor did the State Department take any action on it. The GOC never made an offer to SSA. It only discussed the offer with the State Department, according to the State Department. The discussion between Turbay and Ambassador Forchette was not disclosed to SSA for six months.

52. **November 15, 1994**: The GOC issued a press release proclaiming the success of its poster child's search for the Cordoba galleons on the Serranilla Banks, licensed five months earlier. The headline in *El Espectador* read: "THE CORDOVA SHIPWRECK IS

ANTIQUITY, NOT TREASURE." The GOC propaganda made its case to the Superior Court:

> For the Secretary General of the Presidency, Juan Manuel Turbay, who also presides over the Shipwreck Antiquities Commission, the arrangement with Pacific is one of the better recovery contracts of antique shipwrecks which has been written.

> 'We are not going to see the objects from the flotilla of 1605 in Christies' auctions, because they are a part of our history and neither will we have the inconveniences of the legal type which are being presented with the recovery of the Galleon San Jose,' says Turbay.[4]

53. To draw the parallel between the Cordoba Galleons and the San Jose even closer, *El Espectador* reports: *"The first thing was to be very clear that the North American business could not claim ownership of the objects. Article 72 of the Constitution establishes that...."* The national patrimony recovered by Pacific Geographic Society, and Ocean Sciences Research Institute, during the heralded expedition of its flotilla to the Serranilla Banks was a grand total of: *"three brass nails, a*

---

[4] To put this in context, for 25 years the GOC chanted the mantra that all of the San Jose was national patrimony, and entirely the property of the nation. It dramatically reversed its strategy two years after the Supreme Court ruled in 2007 that SSA was entitled to half of its finds that were identified as treasure, and not national patrimony. Shortly after the Supreme Court ruling, a GOC policy paper was circulated internally to GOC staff as a means of coordinating adversarial activities versus SSA, and to direct research to find ways of circumventing the Supreme Court's ruling. The policy paper, untitled and without attribution, laid out the principal rulings, implied interim methods of obstructing their implementation, and closed by recommending that the Supreme Court rulings be the subject of *"A detailed study...with interdisciplinary support coordinated by a group of lawyers...at the time of formulating the __Subaquatic Patrimony Law Project.__"* (Emphasis added.) In 2009 that "project" was completed and ready to implement. President Uribe appointed several cronies to take over the Antiquities Commission and move aggressively to screen out SSA and take over the San Jose. See ¶ 70 October, 2007, below.

*lead musket ball, and one complete and one fragment of ovular ceramics."* This inventory of artifacts has no value as historic or cultural objects, let alone national patrimony, and it has no market value, so the GOC press release was unwittingly correct in one sense: the treasure collected by Pacific Geographic Society will never be seen in Christie's auctions.   Nor do the artifacts have applicable archeological value.   In particular, they do nothing to identify the Cordoba Galleons as implied in the headline. The Serranilla Banks have collected literally hundreds of shipwrecks in the last 500 years. The artifacts could have come from any one, or several, of many wrecks.   Although El Espectador reported that the contract had already entered *"the operations stage"* it apparently died a quiet death. No further press releases were found, and no mention was made of the distribution of Pacific Geographic Society's share based on the carefully worked out formula for the proceeds from three brass nails, one lead musket ball, and one complete and one fragment of ovular ceramics.   However, less than three months later the GOC offered to trade the Cordoba galleons found by Pacific Geographic Society for SSA's San Jose site, straight across. See below.

54. **January 3, 1995:** SSA lawyer Danilo Devis attended a meeting requested by Antiquities Committee member Rudolpho Segovia. Segovia offered to trade the GOC-owned shipwrecks on the Serranilla Banks (ostensibly the Cordoba Galleons, worth as much collectively as the San Jose) in exchange for SSA's San Jose target, which the GOC claimed was empty. SSA did not respond to Segovia's offer for two reasons: 1) it was not certain the offer came from Segovia personally, or from the GOC (later information strongly suggests the Commission approved of Segovia's verbal offer in advance), and 2)

nothing of value, or even evidence of a known shipwreck had been produced following

the ostensible search of the Serranilla Banks

55. **February 3, 1995**: The GOC informed SSA it would not enter settlement

negotiation until the courts had ruled.

56. **June 21, 1995:**   The magistrates of the Superior Court issued a decree citing

the GOC for its continuing intimidation and threats designed to coerce a favorable

decision from both the judges of the Civil Court and the magistrates of the Superior

Court.   SSA's legal counsel in Washington DC, John Falk, reported the decree to the

Department of State on November 28:

> The court decree ...reveals the Colombian Magistrate's anger
> against the threats that the Public Ministry (Counsel for the Public
> Ministry represents the Government of Colombia in the pending
> litigation) has made against these magistrates, including
> 'disciplinary denunciations if they (magistrates) **stray from the
> path.'**
>
> Since the Sea Search Armada litigation began the Government of
> Colombia has consistently applied this form of inappropriate
> pressure to Colombian magistrates, that has included undertaking
> investigations of judges who rendered the decisions in the 10th
> Civil Circuit Court of Barranquilla.  This behavior, by and through
> the Government of Colombia, of judicial intimidation and threat is
> not only reprehensible but the clearest indication that the American
> citizen investors of Sea Search Armada need the assistance  and
> support of their department of State to insure the ends of justice are
> fully served.

57. It would appear the trust placed in the GOC's "good faith" actions by US

Congressmen was badly misplaced (see Nov. 2, 1995 letter below).   The decree issued by

Colombian magistrates reprimanding the GOC leaves no doubt the GOC was acting in

bad faith.  While the GOC was promising Congressmen it would observe the rule of law

and treat with SSA in good faith, it was in fact abusing the law, attempting to coerce false rulings from judges, and refusing to honor its word to Congressmen.

58. **November 1, 1995**: Foreign Minister Roderigo Prado, and Colombian Ambassador to the U.S. Lleras lobbied Capitol Hill for more U.S. aide to Colombia. Among others, they met with Congressman Benjamin Gilman, Chairman of the Committee on International Relations, Congressman Phil Crane, Chairman of the Subcommittee on Trade of the Committee on Ways and Means, and Congressman Dan Burton, Chairman of the Subcommittee on the Western Hemisphere of the Committee on International Relations. In the course of the meetings, all three Chairmen had raised the issue of the GOC's refusal to settle with SSA over the property it had expropriated from the American investors. Both the Colombian Foreign Minister and Ambassador promised that if the Civil Court followed the precedent ruling of the Constitutional Court and found in favor of SSA, the GOC would settle with SSA.

59. **November 2, 1995:** All three of the Chairmen (above) who met with the GOC lobbyists (Foreign Minister and Ambassador), on or about November 1, 1995, signed a letter on Congressional letterhead reminding Pardo and Lleras of the GOC promise made when they were lobbying for Congress to send additional U.S. tax dollars and equipment to Colombia. The letter stated:

> In a November 1 meeting, you and Ambassador Lleras expressed that your government will be willing to begin discussions with representatives of Sea Search Armada once a decision is rendered on the appeal pending in the Superior Court of Barranquilla. We have conveyed this fact to the representatives of Sea Search Armada...particularly our former colleague, Congressman Guy Vander Jagt...who are eager to begin these discussions.

We trust that the Government of Colombia and the representatives of Sea Search Armada will **both endeavor in good faith to resolve this matter as soon as possible.**" (Emphasis added.)

60. **July 24, 1996:** Chairman Gilman wrote a follow-up to his letter of November 2, 1995, and enclosed a number of letters from other Congressmen and Senators requesting that the GOC keep its promise to settle with SSA. Gilman says, *"It is my opinion that resolution of the Sea Search Armada matter presents your government with a clear opportunity to demonstrate U.S. - Colombia relations and **a firm commitment to the rule of law.**"* (Emphasis added.) Viewed in retrospect, it is clear the GOC had no intention to 1) keep its recent promise to Gilman and other Congressmen, 2) deal with SSA in good faith, or 3) display a firm commitment to the rule of law.

61. **August 26, 1996:** The GOC Foreign Minister replied to House Committee Chairman Ben Gilman, *"Consistent with its past declarations, the Government of Colombia will not make any decisions until after a verdict is made by the judicial...."*

62. **August 29, 1996:** The Charges de' Affaires in the Colombian Embassy in DC said the GOC *"awaits a pending judgment"* and offered to meet (but made the meeting a waste of time, as it made clear there would be no settlement while the matter was in court, where GOC dilatory actions kept it for another eleven years).

63. **September 26, 1996**: SSA's Colombian lawyer wrote to SSA's Washington DC lawyer that despite the decree filed by the Superior Court magistrates June 21, 1995 against the GOC the *modus operandi of coercion* continued. On September 26 the GOC Attorney General launched another round of threats and intimidations thinly disguised as a judicial investigation. Devis pointed out the extraordinary nature of the GOC's

desperate attempts to coerce the decision it wants from the magistrates: *"I do not believe that there are any precedents in the judicial history of Colombia for the initiation of an investigation by the Procurer (Attorney) General's office barely 7 months after the same magistrate was absolved of charges by another investigation which was practically identical, within the same suit."* Devis adds that little can be done to prevent the GOC from exploiting its conflict of interest: *"...unfortunately Colombian law permits the Procurer General of the Nation to be a part of the suit (which he is), and who, moreover, may investigate the judge or the magistrates of the same suit."* The conflict of interest is obvious, as is the GOC's willingness to exploit it to coerce a ruling it knows to be wrong.

64. **September 2, 1996**: The GOC attempted to influence the Superior Court magistrates by bringing public pressure to bear through the Council of State, Chamber of Consultation. Despite its lofty title, the Chamber is little more than a handmaiden to the Colombian President. The Chamber was asked to render a legal opinion in the SSA matter. The Chamber was then briefed on the GOC's case by the General Secretary of the President (i.e. Chief of Staff) Jose Antonio Vargas. The Chamber did not invite SSA to present its side of the case. In yet another example of the GOC respect for the rule of law, it lost no time presenting the Chamber's "official" opinion to the media, the gist being that SSA wasn't entitled to even a 5% finder's fee. The GOC could keep it all. Due to the manipulation of public opinion, SSA counsel Danilo Devis felt compelled to address the Superior Court on a point by point rebuttal of the arguments advanced by Vargas via the Council of State. The Superior Court Magistrates obviously agreed with Devis when it eventually ruled to uphold the ruling by the Civil Court.

65. **Oct. 3, 1996:** Congressman Van der Jagt informed U.S. Ambassador Frechette that Chairman Gilman *et al* believe that a decision by the court that is inconsistent with the Constitutional Court Ruling would not be credible to the US Congress. The Colombian Ambassador promised Chairman Gilman the GOC would make no decision until the appellate court ruled on the matter. However, when the appellate court upheld the lower court ruling, the GOC did not keep its promise to settle with SSA, but instead appealed the Superior Court decision to the Supreme Court. Upon notice that the GOC would appeal, SSA also prepared an appeal on the matter of the handling of any treasure found outside the GOC's Economic Zone. On this small matter the Supreme Court ruled against SSA's appeal, but ruled for it in the larger matter of its property right.

66. **March 7, 1997:** The Superior Court upheld the Civil Court ruling in the matter of SSA v GOC. In addition, <u>it issued a decree and reprimand to the GOC for attempted coercion of the Superior Court magistrates.</u> The ruling in favor of SSA removed the last obstacle established by the GOC as a prerequisite for settlement, which had been promised by the GOC to Congressmen and Senators on many occasions.

67. **May 8, 1997:** The GOC Ambassador to the U.S. informed Chairman Gilman in a letter that the GOC will appeal the decision of the Superior Court to the Supreme Court. The GOC promise to settle with SSA is not even mentioned. After stating that nothing could be settled with SSA until the litigation had run its course (it remained before the Supreme Court another ten years) the Ambassador assured Gilman that the GOC *"remains willing to discuss any relevant topics with the Sea Search Armada."*

68. **March 11, 1997:** Chairman Gilman wrote to the GOC Minister of Foreign Affairs, now Maria Emma Mejia Velez, regarding the recent decision by the Superior Court to uphold the ruling of the Civil Court, thus finding in favor of SSA. Chairman Gilman states, *"In light of this ruling, and your previous communication to me dated August 26, 1996, I believe it is very important for the Government of Colombia and Sea Search Armada to resolve this matter and end the years of related litigation."*

69. **July 5, 2007:**   The Supreme Court of Colombia issued its ruling upholding the lower court decisions, and the legal opinions given to the GOC by its own lawyers in 1982 and again in 1983.

70. **October 2007**: The Antiquities Commission, guided by cronies of President Uribe appointed as "Antiquities Experts," began a strategy growing out of the GOC internal policy paper to steer the San Jose from "national patrimony" to a commercial project involving the GOC and strategically placed political insiders who would profit immensely from the theft of the San Jose. Two such appointees had earlier attempted to wrest the San Jose from SSA, and were conspicuous by their obvious conflicts of interest: 1) German Montoya was at the center of the corruption scandal for his attempts to replace SSA with Swedish businessmen in the 1986 to1989 time frame, 2) Fabio Echeverri brought in Northwest Energy in 1982, and Tommy Thompson[5] in 1994-95. Once in place on the Antiquities Commission they quickly moved it in a new direction, diametrically opposed to the national patrimony it had insisted on for nearly thirty years. Immediately

---

[5] Mr. Thompson is a fugitive of the North American justice system for having swindled 40 million dollars from the famous Christie's Auction House of New York, as a result of the recovery of the boat S.S. Central America, which was precisely his letter of presentation in Colombia.

after President Uribe's latest appointments sat on the Commission, the new mantra was that practically none of the San Jose was national patrimony, and therefore could be shared by private (Colombian) parties. Similar to the corrupt deal with the Swedes (also involving German Montoya) 20 years earlier, the 2010 theft of the San Jose includes first the passage of a law legitimizing the theft while screening out SSA, the charade of a public process to select a contractor who had already been selected privately, a fake contract negotiation which had already been negotiated, and the use of a quasi public agency to give the commercial enterprise an official government face and to help distribute the profits. The GOC Minister of Culture who   oversees the Antiquities Commission, made the turnaround complete by declaring that it is necessary, as stated in the official minutes of the Commission meeting, "...*to determine the criteria for defining what is not patrimony, with some general guidelines, and to be able to **commercialize** what is not a cultural asset.*" Hence, the Minister of Culture says "*concessions may be considered in outlines for sustainability and financing.*"

71. **March 11, 2010**: SSA lawyer Danilo Devis addressed the Administrative Tribunal on the subject of the bad faith actions of the Antiquities Commission, under its new leadership, scheming to steal the San Jose using largely the same strategy it had used in the corrupt deal with Swedes in 1986-1989.

72. **April 29, 2010:** Danilo Devis, acting on information obtained, with great difficulty and by threat of decree, from the Antiquities Commission, once again presented to the Administrative Tribunal the evidence of corruption in the Antiquities Commission surrounding the most recent attempt by the GOC to take over the San Jose.

73. **May 12, 2010:** Following nearly three years of GOC sophistry and delays

since the Supreme Court ruling, the Managing Director of SSA proposed to President

Uribe that they cooperate in a joint recovery of the San Jose:

> "As the legal representative of the company Sea Search Armada, permit me to respectfully propose a joint recovery effort, with previously agreed upon rules, of the shipwreck whose property was defined by the Supreme Court of Justice of Colombia in a June 5, 2007 ruling.

> We hope to obtain your approval Mr. President, and we place ourselves at your disposal to initiate the pertinent conversations according to the policies set forth by the Supreme Court, in a ruling that honored the Colombian justice system.

> "If your answer is not affirmative, or if we receive no answer within 30 days, we will take that to mean that your government is not interested in recovering the shipwreck in the proposed form.  As common and undivided owners, in equal parts, of the treasures that may be found therein, we will unilaterally begin the preparations to recover that which the judicial decision declares belongs to us."

74.  At the end of 30 days, the office of President Uribe replied, to the effect that

the SSA letter cited above didn't officially exist because it wasn't in Spanish, the official

language of Colombia.  SSA's lawyer, Danilo Devis, immediately prepared a similar

notice in Spanish and had it delivered to the office of the President.

75.  **April 27, 2010:** The Legal Secretary to the President replied to SSA's

proposal *"on the specific instruction of the honorable President of the Republic,"* with

four arguments and a threat to use military force if SSA attempted to access its property.

To summarize the President's four arguments: 1) the Supreme Court ruling does not

specifically <u>compel</u> the GOC to <u>**do**</u> something (and it chooses to not cooperate with SSA),

2) *"the legal asset protected by the Supreme Court* (i.e. SSA's target)*...is the Cultural*

*Patrimony of the Nation"[6]* (and, without being compelled by court orders to **do** so, the

GOC in this situation chooses to take action to prevent a private party's use of its

property), 3) SSA is prohibited from visiting its property without prior approval of the

GOC, and 4) the Geneva Convention regarding submerged property on the Continental

Shelf is not applicable in this case. Legal Secretary Del Castillo's letter ends with the

following threat:

> "Considering that this concerns the defense of the integrity of
> Colombian territory, as well as assets owned by the Nation, the
> **National Armed Forces will prevent the realization of
> unauthorized activities in jurisdictional maritime areas...."**
> (Emphasis added.)

76.   **May 12, 2010:** SSA's legal counsel, Danilo Devis, replied to the Legal

Secretary with a detailed rebuttal of the four arguments in Del Castillo's letter of April

27. Devis's letter concludes with the following summation.

> "Ever since the Supreme Court, without affecting the exclusive
> rights of the Nation to its cultural patrimony, definitively resolved
> the litigation over the ownership of the treasures found in the

---

[6] "The specific instructions of the honorable President" to his Legal Secretary on this subject are in keeping with the GOC strategy up to 2010 to disenfranchise SSA by claiming that 100% of the shipwreck was national patrimony, and therefore belonged to Colombia, who would keep it in perpetuity. However, several influential Colombians who had long coveted the San Jose, as documented elsewhere in this chronology, were appointed to the Antiquities Commission by President Uribe, and quickly convinced other Commission members that $3 billion in gold from other South American countries stored in a Colombia museum forever wouldn't benefit anybody. From the new viewpoint of enlightened self interest, Commission members could think of better uses for gold than to remain in storage forever. The Commission thus chose to directly contradict the position it had reiterated for years. Beginning in late 2009, the new position of the GOC was that none of the ship was patrimony, but was entirely treasure, and therefore need not be locked away. Moreover, as treasure it could be shared between the Nation and a third party Colombian contractor. And finally the contractor would take its share out of SSA's share. This dramatic and convenient change is evidenced in 1) 2009 and 2010 minutes of meetings of the Antiquities Commission, and 2) the bill introduced in Parliament by the Commission on or about July 20, 2010.

shipwreck by ruling dated July 5, 2007, the attitude of the National Government and the way in which it has taken that result have been extremely hostile, making it clear that it is not disposed to permit the enforcement of that ruling, if its counterpart participates in that process. To the point of refusing even to hold a dialogue on the possibility – just the possibility – of their joint recovery by the co-owners.

"So much and such unjust hostility contrasts with the intention of the Commission on Shipwrecked Antiquities – where the oldest and most persistent aspirants to the recovery contract have seats – of entrusting a third party with the recovery, to whom the delivery in-kind is planned of up to 50% of the treasures that by judicial stipulation belong to their finder.

"What is true is that all instances and appeals of the Colombian judicial system being exhausted in its favor, without exception, and any possibility of agreement on a joint recovery of the shipwreck having been discarded by the National Government – and even any possibility of dialogue in search of that agreement –   such pugnacious as well as inexplicable intransigence in the face of a judicial decision leaves no other recourse, as announced, than to turn to the authorities and space offered by International Law, as the only way to assure the threatened rights granted to Sea Search Armada by the highest judicial organ of Colombia."

77. **July 20, 2010** (on or about): The Minister of Culture, representing the Antiquities Administration (under her jurisdiction) delivered to the Parliament the bill to be enacted as the first step in the transfer of SSA's expropriated assets to political cronies of President Uribe.

## C. **Colombia's Refusal to Comply with the Judicial Ruling**

78. Subsequent to the Supreme Court's ruling, SSA has informed Colombia that it intends to initiate salvage operations and that SSA has begun taking steps to perform such operations.

79. Despite the Supreme Court's ruling, Colombia has not allowed SSA to initiate salvage operations of the San Jose. Colombia has even gone so far to threaten military intervention if SSA attempts to initiate salvage operations.

80. Upon information and belief certain individuals with political influence with the Government of Colombia unhappy with the Colombian Ruling pursued actions to deprive SSA of its rights to the property located at the San Jose site.

81. Based on this influence, the Government of Colombia took several actions to avoid or ignore the effect of the Colombia Ruling. The first of these actions was litigation initiated in the Administrative Court of Cundinamarca, a suit that was initiated after the Civil Court in Barranquilla ruled in SSA's favor.

82. Additionally, the Government of Colombia attempted to coerce the justices of the Colombian Supreme Court to have the justices reverse the Colombian Ruling. For which actions the Superior Court officially sanctioned the GOC.

83. Subsequently, these influential Colombians who had been appointed to Colombia's Commission on Antiquities, arranged for the GOC to contract with a "US expert," who allegedly surveyed the *San Jose* site and found nothing there. The alleged "US expert" subsequently disappeared and has not been located to this day. The court responded to the GOC strategy by embargoing the *San Jose* site to prevent a second Executive Branch attempt, and to prevent the planned salvage stage, as announced earlier by the GOC.

## Count I

### (Breach of Contract)

84. Plaintiff incorporates by reference paragraphs 1 through 83 above.

85.   Colombia and SSA's predecessor entered into a contractual obligation whereby for the exchange of valuable consideration each party agreed to perform certain duties.   Under the Agreement SSA was obligated to perform search and salvage operations at the *San Jose* site and Colombia agreed to not interfere with SSA's operations at the site.

86.  The parties further agreed that they would equally share any things of value retrieved from the site.

87.  SSA and its predecessor have at all times performed their obligations under the Agreement.

88.  Despite the Plaintiff's adherence to the terms of the Agreement, Colombia has failed to comply with its obligations.  Specifically, Colombia has refused to permit SSA to initiate salvage operations at the site and is therefore misappropriating SSA's property valued in the amount of $4 billion to $17 billion

89.  SSA respectfully requests that the Court render judgment in its favor in the amount of $17 billion compensatory damages, the Plaintiff's costs to bring this suit, attorneys' fees, and such other relief as the Court deems appropriate.

## Count II

### (Conversion)

90.  Plaintiff incorporates by reference paragraphs 1 through 89 above.

91. The Colombian Ruling determined that Colombia and SSA owned any treasures recovered from the *San Jose* site in equal shares.

92. Subsequent to the Supreme Court's ruling, SSA has informed Colombia that it intends to initiate salvage operations and that SSA has begun taking steps to perform such operations.

93. Despite the Supreme Court's ruling, Colombia has not allowed SSA to initiate salvage operations of the San Jose. Colombia has even gone so far to threaten military intervention if SSA attempts to initiate salvage operations.

94. By its actions Colombia has intentionally exercised dominion and control over SSA's chattels which intentional dominion and control by Colombia so seriously interferes with SSA's right to control the chattels that SSA is deprived of its chattels.

95. SSA respectfully requests that the Court render judgment in its favor in the amount of $17 billion compensatory damages, the Plaintiff's costs to bring this suit, attorneys' fees, and such other relief as the Court deems appropriate.

## Count III

### (Recognition and Enforcement of Foreign Judgment)

96. Plaintiff incorporates by reference paragraphs 1 through 95 above.

97. Believing that the retroactive Seizure Law violated the Colombian Constitution as well as international and United States law, after fruitless negotiations with Colombia to modify the Seizure Law, in 1989 SSA filed suit against Colombia in the Circuit Court of Barranquilla, Colombia and the Colombian Constitutional Court.

98. Subsequently on March 10, 1994, the Colombian Constitutional Court ruled in SSA's favor finding that the Seizure Law was unconstitutional and void. Based on this ruling, on July 6, 1994, the Circuit Court entered judgment finding that the treasures of the *San Jose* were owned in equal (50% and 50%) shares by Colombia and SSA.

99. Subsequently, Colombia appealed the Circuit Court's decision to the Colombian Superior Court. In 1997 Colombia's appeal was denied.

100. Thereafter, Colombia appealed to the Supreme Court of Colombia (the highest judicial authority in that country). On July 5, 2007 the Colombian Supreme Court issued a ruling (the "Colombian Ruling") denying Colombia's appeal and finding that Colombia and SSA owned any treasures recovered from the *San Jose* site in equal shares.

101. In accordance with DC Stat. § 15-382, the Colombian Judgment is conclusive between the parties and is enforceable in the same manner as the judgment of a Court from a United States jurisdiction which is entitled to full faith and credit by this Court.

102. SSA respectfully requests that the Court render judgment in its favor in the amount of $17 billion compensatory damages, the Plaintiff's costs to bring this suit, attorneys' fees, and such other relief as the Court deems appropriate.

**WHEREFORE** Plaintiff respectfully request judgment in the amounts requested.

Respectfully submitted,

Date: ___12/6/10___

By: _____
James S. DelSordo, Esq.
DC Bar No. 498507
Argus Legal, LLC
9255 Center St.
Suite 307
Manassas, Virginia 20110
(703) 368-8770
fax (703) 368-8772

Counsel for Plaintiff Sea Search Armada